[L.A. No. 30030. In Bank. Mar. 14, 1973.]

JANET STEVENS, a Minor, etc., et al., Plaintiffs and Appellants, v.
PARKE, DAVIS & COMPANY, Defendant and Appellant;
A. J. BELAND, Defendant and Respondent.

## COUNSEL

Harney, Ford & Schlottman, Harney, Ford & Charbonneau, David M. Harney, Robert L. Charbonneau and Robert E. Ford for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher and G. Edward Fitzgerald for Defendant and Appellant.

Ball, Hunt, Hart, Brown & Baerwitz and George C. McCarthy for Defendant and Respondent.

## OPINION

**SULLIVAN, J.**—In this action for damages for wrongful death, plaintiffs appeal from an order granting defendants Parke, Davis & Company (Parke, Davis) and A. J. Beland, M.D. (Dr. Beland), a new trial on the issue of damages. Defendant Parke, Davis appeals from the judgment entered on the verdict in favor of plaintiffs and against Parke, Davis, and from the order denying said defendants' motion for judgment notwithstanding the verdict.[1]

Plaintiffs Janet, Suzanne and Kennan Stevens are the surviving children, and plaintiff John Stevens is the surviving husband, of Phyllis Stevens who died allegedly as a result of ingesting the drug Chloromycetin which was manufactured by Parke, Davis and prescribed by Dr. Beland. Since her youth, Mrs. Stevens had suffered from a chronic lung condition that was both discomforting and conducive to lung infection. She was nevertheless able to function normally as a housewife and mother of three children, and planned, after receiving a teaching credential, to work part-time as a substitute teacher.

In 1964, Mrs. Stevens sought the aid of Dr. Beland to see if something could be done for her lung condition that would make it easier for her to teach. Dr. Beland's initial physical examination disclosed that Mrs. Stevens, then 38 years of age, was of generally good health. However, X-rays confirmed that she was suffering from a lung condition diagnosed as bilateral bronchiectasis, an anatomical derangement in the bronchial tree that increases the susceptibility to lung infection. To alleviate this disorder, Dr. Beland recommended and eventually performed surgery on September 1, 1964.

Two days after the operation, Dr. Beland prescribed the first of six administrations of Chloromycetin, a broad-spectrum antibiotic used to

---

[1]Dr. Beland also took an appeal from the judgment but later abandoned it.

guard against infection. The final dose was administered on November 20, 1964. Mrs. Stevens failed to improve following the surgery, and in June 1965 she was referred to Dr. Kurnick, a hematologist.

Dr. Kurnick found Mrs. Stevens to be suffering from bone marrow failure (aplastic anemia), that is, the inability of bone marrow to produce blood cells in sufficient numbers to ward off general infection. He testified that, in his opinion, this condition was caused by the administration of Chloromycetin, which has a history of causing aplastic anemia in certain patients and is thus considered by members of the medical profession to be a dangerous drug.[2] Mrs. Stevens died of pneumonia on December 25, 1965, as a result of the inability of her body to produce the necessary blood cells to resist infection.

We summarize the evidence in the record bearing upon the development and promotion of the above antibiotic. Chloromycetin is the trade name give by Parke, Davis to the antibiotic drug chloramphenicol. Discovered in 1946, the drug first reached the market in 1949 after tests by Parke, Davis as to its effectiveness. Shortly thereafter, articles began appearing in medical journals, associating Chloromycetin with blood dyscrasias (disorders) such as aplastic anemia. In 1952, the United States Food and Drug Administration (FDA), after its own investigation, allowed continued sale of the drug but directed Parke, Davis to include the following warning on each label of the drug: "Warning — Blood dyscrasias may be associated with intermittent or prolonged use. It is essential that adequate blood studies be made."[3] Shortly thereafter, Parke, Davis, dis-

---

[2] Several doctors testified that Chloromycetin was the single most dangerous antibiotic on the market at the time of Mrs. Stevens' treatment. There was also ample testimony that the prescription of Chloromycetin in this case did not meet the standard of medical practice of the community in which Dr. Beland practiced.

[3] In 1961, pursuant to a further directive of the FDA, the language on the label was changed to read as follows: "Warning—Blood dyscrasias may be associated with the use of Chloramphenicol. It is essential that adequate blood studies be made. See enclosed warnings and precautions." The last sentence referred to the following detailed warning which appeared on all package inserts accompanying the sale of the product: "WARNING [¶] Serious and even fatal blood dyscrasias (aplastic anemia, hypoplastic anemia, thrombocytopenia, granulocytopenia) are known to occur after the administration of chloramphenicol. Blood dyscrasias have occurred after short term and with prolonged therapy with this drug. Bearing in mind the possibility that such reactions may occur, chloramphenicol should be used only for serious infections caused by organisms that are susceptible to its antibacterial effects. Chloramphenicol should not be used when other less potentially dangerous agents will be effective, or in the treatment of trivial infections such as colds, influenza, viral infections of the throat, or as a prophylactic agent.

"Precautions: It is essential that adequate blood studies be made during treatment with the drug. While blood studies may detect early peripheral blood changes, such as leukopenia or granulocytopenia, before they become irreversible, such studies cannot

tributed "Dear Doctor" letters to the medical profession, summarizing the results of the FDA investigation.

Notwithstanding the FDA's efforts to require adequate warnings concerning the use of Chloromycetin, Parke, Davis retained considerable latitude to promote and advertise its drug, in some instances without any warning whatsoever. Following the FDA directive of 1952, Parke, Davis sent letters to its salesmen that appeared to minimize the dangers of the drug.[4] Its salesmen continued concentrated promotions of Chloromycetin from 1952 through the period covered in this case. These promotions included personal visits to doctors by "detail men" urging them to use the drug; no verbal warnings were given on these occasions, although brochures left with the physicians apparently included written warnings. Other promotional methods included the dissemination of calendars, rulers and other "give-aways" carrying the name Chloromycetin, but no warning language. Full-page "reminder ads" were published in medical journals, but contained no reference to the possibility of harmful side effects.[5] Nor did Parke, Davis include any warning concerning Chloromycetin in the description of the drug contained in the 1962 edition of the Physicians' Desk Reference (PDR), an encyclopedia of drugs widely used by physicians.[6]

Plaintiffs brought the present action for damages for the wrongful death of Phyllis Stevens allegedly caused by the administration of Chloromycetin. The complaint named Parke, Davis and Dr. Beland as defendants, and stated three separate causes of action as to each: liability based on negligence (of Parke, Davis for overpromotion of the drug, and of Dr. Beland, for lack of due care in prescribing it); liability based on breach of implied

---

be relied upon to detect bone marrow depression prior to development of aplastic anemia."

Dr. Beland testified that, as the prescribing doctor, he did not have access to this warning statement which was included with the drug when sold to a pharmacist.

[4]One such letter stated that "Chloromycetin has been officially cleared by the Federal Drug Administration and the National Research Council with *no restrictions* on the number of or range of diseases for which Chloromycetin may be administered." (Original italics.) A subsequent letter contained the following language: "[I]ntensive investigation by the Food and Drug Administration carried on with the assistance of a special committee of eminent specialists appointed by the National Research Council resulted in unqualified sanction of the continued use of Chloromycetin for all conditions in which it had previously been used."

[5]Under the FDA directives, Parke, Davis was obligated to include warnings only in advertising material that stated specific recommendations as to proper uses and dosage.

[6]Earlier editions of the PDR had contained concise warnings, and these were again included in the 1964 edition of the PDR, due to criticism by physicians over their omission.

warranty; and strict liability in tort. After the presentation of plaintiff's case, the trial court granted Parke, Davis' motion for nonsuit as to the second and third causes of action, but denied it as to the first cause of action based on negligence.[7] The court also denied Dr. Beland's motion for nonsuit.[8]

The jury returned a verdict in favor of plaintiffs and against both defendants in the amount of $400,000. The trial court, however, ordered remittitur of the verdict to the sum of $64,673.42 on the ground that excessive damages were awarded due to the "prejudice and passion" of the jury. Plaintiffs' failure to consent to the remission resulted in an order granting defendants' motions for new trial solely on the issue of damages. The instant appeals followed.

## I

We first take up plaintiffs' appeal from the order granting a new trial. Each of the defendants separately moved for a new trial on several grounds. The trial judge denied the motions on the issue of liability but granted a new trial as to both defendants solely on the issue of damages. An examination of the court's order, which we set forth in relevant part in the margin,[9] discloses that it was based on the sole ground that the damages were excessive. (Code Civ. Proc., § 657, subd. 5.)[10] Plaintiffs con-

---

[7]Plaintiffs have not appealed from the judgment of nonsuit in favor of Parke, Davis.

[8]Although the complaint asserted liability against Dr. Beland on each of the three causes of action, the case appears to have been tried against him only on the theory of negligence.

[9]The order states in pertinent part: "Motions for new trial are denied on the issue of liability. On the issue of excessiveness of the verdict, the Court finds that the verdict is excessive, that it is not sustained by the evidence, and that it is based upon prejudice and passion on the part of the jury. It is therefore ordered that a new trial be granted, on the issue of damages only, unless the plaintiffs consent to a remission of the verdict to the sum of $60,000.00 general damages plus $4,673.42 special damages . . . ."

[10]We observe that in moving for a new trial on the ground of excessiveness of damages both defendants incorporated the former language of section 657, subdivision 5, prior to its 1967 amendment, namely "Excessive damages, appearing to have been given under the influence of passion or prejudice." As will be noted (see fn. 9, *supra*) the trial court in its order stated that the verdict "is based upon prejudice and passion on the part of the jury." At the time the motions were made, subdivision 5, as amended in 1967, provided merely as follows: "Excessive or inadequate damages." We, therefore, consider the motions to have been made according to the amended statute.

Although the order also states that the verdict "is not sustained by the evidence" we do not deem it necessary to treat it as having granted the new trial on the additional ground of "[i]nsufficiency of the evidence to justify the verdict" as specified in subdivision 6 of section 657. A finding that the damages were excessive necessarily

tend that this order should be reversed because it fails to contain an adequate specification of reasons in compliance with Code of Civil Procedure section 657. We agree.

Section 657 provides in relevant part as follows: "When a new trial is granted, on all or part of the issues, the court shall specify the ground or grounds upon which it is granted *and the court's reason or reasons* for granting the new trial upon each ground stated.

" . . . . . . . . . . . . . .

" . . . on appeal from an order granting a new trial upon the ground of the insufficiency of the evidence to justify the verdict or other decision, or upon the ground of excessive or inadequate damages, it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, . . ." (Italics added.)

We have said that "[n]o hard and fast rule can be laid down as to the content of such a specification, and it will necessarily vary according to the facts and circumstances of each case." (*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 115 [65 Cal.Rptr. 315, 436 P.2d 315].) ▮ However, we have emphasized on several occasions that if the ground relied upon is "insufficiency of evidence," the trial judge's specification of reasons "must briefly identify the portion of the record which convinces the judge 'that the court or jury clearly should have reached a different verdict or decision.' " (*Id.* at p. 116, fn. omitted, quoting from Code Civ. Proc., § 657, third paragraph; see *Miller* v. *Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689 [106 Cal.Rptr. 1, 505 P.2d 193]; *Scala* v. *Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359 [90 Cal.Rptr. 592, 475 P.2d 864].)

In *Mercer,* in delineating the particular requirement for the ground of

implies that that evidence did not justify the award. (*Sinz* v. *Owens* (1949) 33 Cal.2d 749, 760 [205 P.2d 3, 8 A.L.R.2d 757]; *Van Ostrum* v. *State of California* (1957) 148 Cal.App.2d 1, 4 [306 P.2d 44]. See also 5 Witkin, Cal. Procedure (2d ed. 1971) pp. 3617-3618; Cal. Civil Procedure During Trial (Cont. Ed. Bar 1960) p. 502.) This view is also supported by the language of section 657, which states in part: "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless *after weighing the evidence* the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." (Italics added.) Therefore, we have construed the new trial order in this case to be based solely on the ground of excessiveness of damages. At any rate, as the following discussion demonstrates, the same rules regarding specification of reasons apply to both excessiveness of damages and insufficiency of the evidence to support the verdict insofar as it awards damages.

insufficiency of evidence, we indicated that only in this way could the twofold purpose of the specification exacted by the statute be fulfilled. That purpose, we explained at length, was to encourage careful deliberation by the trial court before ruling on the new trial motion and to make a sufficiently precise record to permit meaningful appellate review. (*Mercer* v. *Perez, supra,* 68 Cal.2d at pp. 112-116.)

In *Scala* and *Miller* we struck down new trial orders that, although purporting to specify reasons to support the ground of insufficiency of the evidence, were phrased in terms of ultimate facts[11] and thus merely restated the grounds of the orders. As we stated in *Scala:* "[A] specification which merely recites that under the court's view of the evidence 'the defendant was not negligent' or 'the plaintiff was negligent' is of little if any assistance to the appellant or to the reviewing court." (*Scala* v. *Jerry Witt & Sons, Inc., supra,* 3 Cal.3d at p. 366.)

After reviewing the aforementioned cases in light of the language of section 657, we are of the opinion that the same rules that apply to a specification of reasons in respect to the ground of insufficiency of the evidence should apply to a specification of reasons in respect to the ground of excessive or inadequate damages. Indeed, to state that the damages awarded by the jury are excessive is simply one way of saying that the evidence does not justify the amount of the award. (*Doolin* v. *Omnibus Cable Co.* (1899) 125 Cal. 141, 144 [57 P. 774]; 5 Witkin, *op. cit. supra,* p. 3618; see also fn. 10, *supra.*) The same statutory test applies in determining whether a new trial should be granted either on the ground of excessive or inadequate damages, or on the ground of insufficiency of the evidence.[12] In addition, section 657 provides that, only as to these two grounds, "it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specification of reasons, . . ." In light of the parallel treatment of the two grounds in the statute, we are of the opinion that what we have said as

---

[11]The new trial order in *Scala* stated: " '[T]here is no sufficient evidence to show that the defendant was negligent and the evidence does show that the plaintiff failed to use ordinary care for his own safety and that that failure was a proximate of his injuries.' " (*Scala* v. *Jerry Witt & Sons, Inc., supra,* 3 Cal.3d at p. 363.) The new trial order in *Miller* contained the following "reason": "[T]he District completely and adequately discharged any obligation it had in the maintenance of the basin and dam as demonstrated by the overwhelming preponderance of the evidence." (*Miller* v. *Los Angeles County Flood Control Dist., supra,* 8 Cal.3d at p. 696.)

[12]Section 657 states in relevant part: "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."

to the required content of the specification where "insufficiency of the evidence" is relied upon should apply where "excessive or inadequate damages" is the designated ground.

In applying these rules to the instant case, we note that the new trial order makes no pretense of specifying reasons upon which the judge based his decision to grant defendants' motions. The statement that the "verdict is excessive, that it is not sustained by the evidence" is, as in *Scala* and *Mercer*, a statement of ultimate fact that does not go beyond a statement of the ground for the court's decision. It does not indicate the respects in which the evidence dictated a less sizable verdict, and fails even to hint at any portion of the record that would tend to support the judge's ruling. Certainly the statement that the amount of the verdict was "based upon prejudice and passion on the part of the jury" is not a "reason" that provides an insight into the record.

Defendants argue, however, that the trial judge *did* comply with section 657 when, during oral argument upon the motions for new trial, he alluded to the reasons for which he found the award of damages excessive.[13] Even if these oral statements were adequately specific reasons, there would be no merit to this contention. First, a careful reading of section 657 leaves no room for doubt that the reasons required to be specified by that section must be contained either in the order granting a new trial or in a separately prepared and signed statement in writing filed with the clerk within 10 days after the filing of the order. (§ 657, 4th par.) If defendants' argument were accepted, it would defeat the objective, which we stressed in *Mercer,* of providing a precise record for appellate review since it would necessitate a close inspection of the record for any oral statement by the trial judge that could be construed as a reason for granting a new trial.

In *Miller* v. *Los Angeles County Flood Control Dist., supra,* 8 Cal.3d 689, we reversed a new trial order based on the ground of insufficiency of the evidence because the trial judge failed to adequately specify his reasons for the order. Defendants there argued that adequate reasons for granting the new trial were contained elsewhere in the trial court's order,

---

[13]At one point the trial judge stated: "We have a situation that is the death of a housewife with three children and a husband. We had very meager evidence with regard to an earning capacity based upon the obtaining of a temporary teacher's certificate, and the argument made that she could and would have been a school teacher and capable of earning—I think the assertion is $5,000 a year. I am inclined to the opinion that whether or not she would have earned anything like that in the future was highly conjectural, that the evidence would not sustain a finding to the effect that that was established with reasonable certainty."

in a section dealing with the denial of defendant's motion for a judgment notwithstanding the verdict. We rejected that argument, since section 657 was intended to preclude guesswork over "reasons" stated outside the order that could conceivably be read into a new trial order. (8 Cal.3d at p. 698, fn. 8.) ▮ Similarly, in this case we hold that section 657 contemplates a written specification of reasons that may be set forth in only two places—either in the order itself or in a separate document filed with the clerk. It is highly significant, we think, that in either event the mandate of the statute is that the specification of reasons be *in writing, signed* by the trial judge and *filed with the clerk.* In the case at bench, the oral statements made by the trial judge at the hearing of the motions clearly do not satisfy this requirement.

▮ The new trial order in this case was based solely upon the ground of excessive damages. Since "it shall be conclusively presumed that said order as to such ground was made only for the reasons specified in said order or said specifications of reasons" (Code Civ. Proc., § 657), and no reasons were specified, the order granting a new trial cannot be sustained upon this ground. Neither defendant contends that the order can be sustained on another ground; it must therefore be reversed. ▮ It follows that the judgment will be automatically reinstated as to both defendants. (*Miller* v. *Los Angeles County Flood Control Dist., supra,* 8 Cal.3d at p. 699; *Mercer* v. *Perez, supra,* 68 Cal.2d at pp. 118-124.)

Before turning to consider the appeal of defendant Parke, Davis, we note that defendant Dr. Beland has abandoned his appeal from the judgment. (Cal. Rules of Court, rule 3(c); see 5 Witkin, *op. cit. supra,* p. 3694; 6 Witkin, *op. cit. supra,* p. 4324.) ▮ Therefore, reinstatement of the judgment will automatically be final as to Dr. Beland. (*Miller* v. *Los Angeles County Flood Control Dist., supra,* 8 Cal.3d at p. 699.)

## II

We take up the appeal of defendant Parke, Davis from the judgment and from the trial court's order denying its motion for judgment notwithstanding the verdict. Defendant basically makes two contentions: First, that the record shows as a matter of law that Parke, Davis was not negligent; and second, that the court committed reversible error in respect to rulings on the evidence, rulings as to the alleged misconduct of plaintiffs' counsel, and instructions to the jury.

In casting its first contention in the above mold, defendant seemingly ignores not only the well-settled principles governing our review but also the heavy burden it bears in order to overthrow the jury's verdict. When

such an attack is made on the verdict, our power *"begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." (*Primm* v. *Primm* (1956) 46 Cal.2d 690, 693 [299 P.2d 231], original italics.) Defendant, on the other hand, in order to sustain its contention must "demonstrate that there is *no* substantial evidence to support the challenged findings." (Italics added.) (*Nichols* v. *Mitchell* (1948) 32 Cal.2d 598, 600 [197 P.2d 550]; see *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) Thus, our review requires us to focus on evidence that is favorable to plaintiffs, rather than to weigh favorable evidence against unfavorable. (*Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384].)

Essentially, defendant's first contention boils down to this: that the evidence does not support the implied finding of the jury that Parke, Davis was negligent in that it failed to provide an adequate warning to the medical profession as to the dangers of Chloromycetin and it so overpromoted Chloromycetin as to cause Dr. Beland to prescribe the drug. In support of this contention, defendant argues as follows: that it was not negligent in preparing or using the warning label that accompanied the drug; that the warning label to Dr. Beland was not watered down; that Dr. Beland was aware of the warning but nevertheless prescribed the drug; and that his intervening acts superseded any possible negligence of Parke, Davis, thus insulating it from liability. Essentially these arguments are of a tenor more properly directed to a trier of fact. They not only ignore the rules of review set forth above but also disregard the cardinal principle that the evidence must be viewed in the light most favorable to respondents and all intendments and reasonable inferences be indulged in to sustain the findings. (*Peterson* v. *Grieger, Inc.* (1961) 57 Cal.2d 43, 51-52 [17 Cal.Rptr. 828, 367 P.2d 420].) We shall proceed to consider defendant's contention according to all of the above principles.

We first advert to the rules determining defendant's liability. ■ One who supplies a product directly or through a third person "for another to use is subject to liability to those whom the supplier should expect to use the [product] with the consent of the other . . . for physical harm caused by the use of the [product] in the manner for which and by a person for whose use it is supplied, if the supplier [¶] (a) knows or has reason to know that the [product] is or is likely to be dangerous for the use for which it is supplied, and [¶] (b) has no reason to believe that those for whose use the [product] is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." (Rest. 2d Torts, § 388;

see also *Love* v. *Wolf* (1964) 226 Cal.App.2d 378, 395 [38 Cal.Rptr. 183]; *Tingey* v. *E. F. Houghton & Co.* (1947) 30 Cal.2d 97, 102 [179 P.2d 807]; *Gall* v. *Union Ice Company* (1951) 108 Cal.App.2d 303, 309-310 [239 P.2d 48]; *Yarrow* v. *Sterling Drug, Inc.* (D.S.Dak. 1967) 263 F.Supp. 159, 162, affd. in *Sterling Drug, Inc.* v. *Yarrow* (8th Cir. 1969) 408 F.2d 978, 993; *Sterling Drug, Inc.* v. *Cornish* (8th Cir. 1967) 370 F.2d 82, 84-85.)

■ In the case of medical prescriptions, "if adequate warning of potential dangers of a drug has been given to doctors, there is no duty by the drug manufacturer to insure that the warning reaches the doctor's patient for whom the drug is prescribed." (*Love* v. *Wolf, supra,* 226 Cal.App.2d at p. 395, citing *Magee* v. *Wyeth Laboratories, Inc.* (1963) 214 Cal. App.2d 340, 350-351 [29 Cal.Rptr. 322].) However, mere compliance with regulations or directives as to warnings, such as those issued by the United States Food and Drug Administration here, may not be sufficient to immunize the manufacturer or supplier of the drug from liability. The warnings required by such agencies may be only minimal in nature and when the manufacturer or supplier knows of, or has reason to know of, greater dangers not included in the warning, its duty to warn may not be fulfilled. Although the manufacturer or supplier of a prescription drug has a duty to adequately warn the medical profession of its dangerous properties or of facts which make it likely to be dangerous, an adequate warning to the profession may be eroded or even nullified by over-promotion of the drug through a vigorous sales program which may have the effect of persuading the prescribing doctor to disregard the warnings given. (*Love* v. *Wolf, supra,* 226 Cal.App.2d at p. 396; *Yarrow* v. *Sterling Drug, Inc., supra,* 263 F.Supp. at pp. 162-163; *Incollingo* v. *Ewing* (1971) 444 Pa. 263, 299 [282 A.2d 206, 220].)

Two of the cases cited above are particularly germane to the case at bench. In *Love* v. *Wolf, supra,* 226 Cal.App.2d 378, the plaintiff sued her physician, Dr. Wolf, and Parke, Davis & Company for damages for personal injuries after she had developed aplastic anemia following the administration of Chloromycetin, prescribed by the doctor and manufactured by Parke, Davis. The court reversed a judgment entered on a verdict for plaintiff and against both defendants, due to the misconduct of plaintiff's counsel at trial. At the same time, however, it rejected as without merit Parke, Davis' contention that such reversal should be with a direction to the trial court to enter a judgment for Parke, Davis since, so it was argued, the record showed as a matter of law that such defendant was liable neither for breach of warranty nor for negligence. While noting the numerous warnings distributed by Parke, Davis, the court nevertheless stated: "We,

therefore, must not only accept this evidence as sufficient to establish that Chloromycetin was an extremely toxic agent which did cause Mrs. Love's anemia, but also we must accept the evidence leading to justifiable inferences that Parke, Davis, believing otherwise, had watered down its regulations-required warnings and had caused its detail men to promote a wider use of the drug by physicians than proper medical practice justified."[14] (*Id.* at p. 402.)

In *Incollingo* v. *Ewing, supra,* 282 A.2d 206, the Supreme Court of Pennsylvania refused to reverse a judgment against Parke, Davis for damages arising from plaintiff's death as a result of Chloromycetin, despite evidence of the same warnings concerning the drug that was introduced in this case. The court held: "We think that whether or not the warnings on the cartons, labels and literature of Parke, Davis in use in the relevant years were adequate, and whether or not the printed words of warning were in effect cancelled out and rendered meaningless in the light of the sales effort made by the detail men, were questions properly for the jury. Action designed to stimulate the use of a potentially dangerous product must be considered in testing the adequacy of a warning as to when and how the product should *not* be used; if detail men are an effective means of selling a product and explaining its nature, a jury could find that they also afforded an effective medium of conveying a warning." (*Id.* at p. 220.)

█ Mindful of the principles already alluded to which govern our review, we are satisfied that the evidence in the record together with the reasonable inferences therefrom supports the implied finding of the jury that Parke, Davis negligently failed to provide an adequate warning as to the dangers of Chloromycetin by so "watering down" its warnings and so overpromoting such drug that members of the medical profession, including Dr. Beland, were caused to prescribe it when it was not justified. A summary of the facts set out at the beginning of this opinion supports this inference. Soon after the introduction of Chloromycetin, articles published in medical journals and an investigation by the FDA linked the development of blood disorders with intermittent or prolonged use of the drug. Thus, Parke, Davis had reason to know of the drug's dangerous propensities. Nevertheless, calendars and other "give-aways" distributed by Parke, Davis and advertisements placed by it in magazines constantly reminded physicians of the alleged effectiveness of the drug without mentioning its dangers. The Physicians' Desk Reference (PDR), intended as an informative reference on drugs, contained no information as to side effects. Most

---

[14]On retrial, Parke, Davis was again found liable and judgment against it was affirmed on appeal. (*Love* v. *Wolf* (1967) 249 Cal.App.2d 822 [58 Cal.Rptr. 42].)

importantly, numerous personal visits to physicians by salesmen, a highly effective means of promoting the use of Chloromycetin, were not employed to disseminate information as to the drug's hazards, even though such warnings would have entailed no additional burden. Indeed, letters written by the management of Parke, Davis encouraged the salesmen to counter allegations by physicians concerned over the dangers of the drug.

The warnings given in this case were not so clearly effective as to defeat, as a matter of law, the inference that they were nullified by overpromotion. Many prescribing physicians would not come into contact with package inserts or warning labels attached to the drug when the pharmacist filed the prescription. "Dear Doctor" letters might have been easily disregarded in the bulk of everyday mail received by the physician. It was within reason for the jury to find such warnings inadequate and to hold Parke, Davis liable for failing to reasonably warn of the drug's danger.

Parke, Davis contends, however, that even if it did overpromote the drug, this overpromotion was not the proximate cause of Mrs. Stevens' death. In support of this contention, it points to testimony of Dr. Beland that he was cognizant of the dangers involved in continuously prescribing Chloromycetin for a patient.[15] Parke, Davis argues that this testimony establishes as a matter of law that the negligence of Dr. Beland was an intervening cause which exonerated Parke, Davis from liability. (See *Magee* v. *Wyeth Laboratories, Inc., supra,* 214 Cal.App.2d at pp. 351-352.)

We reject this contention as devoid of merit on two bases. First, it was the province of the jury to resolve the conflicts in the evidence and to pass upon the weight to be given the evidence. (*Wolfskill* v. *Los Angeles Ry. Co.* (1900) 129 Cal. 114, 116 [61 P. 775]; *Green* v. *Green* (1963) 215 Cal.App.2d 31, 34 [30 Cal.Rptr. 30].) It is well settled that the trier of fact may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted. (*People* v. *Davis* (1957) 48 Cal.2d 241, 248 [309 P.2d 1]; *People* v. *Crooker* (1956) 47 Cal.2d 348, 355 [303 P.2d 753], affd. 357 U.S. 433 [2 L.Ed.2d 1448, 78 S.Ct. 1287]; *Chan* v. *Title Ins. & Trust Co.* (1952) 39 Cal.2d 253, 258 [246 P.2d 632]; *People* v. *Rodriguez* (1959) 169 Cal.App.2d 771, 777 [338 P.2d 41].) ▮ As was said in *Nevarov* v. *Caldwell* (1958) 161 Cal. App.2d 762, 777 [327 P.2d 111], "the jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the

---

[15]Dr. Beland first began prescribing Chloromycetin in 1950. He testified that, at the time the present cause of action arose, he was aware that Chloromycetin had been linked to aplastic anemia in certain cases and that its prolonged administration carried some danger of fatality.

accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material. [Citations.]"

■ There is adequate circumstantial evidence in the record before us to support a reasonable inference by the jury that Dr. Beland was induced to prescribe the drug for Mrs. Stevens because of Parke, Davis' overpromotion. Like many others of the profession, he had been exposed to the promotional tactics employed by Parke, Davis.[16] It is reasonable to assume that the company's efforts consciously or subconsciously influenced him. In addition, plaintiff introduced expert testimony by a physician that the advertising and promotion of the drug "played a role" in inducing physicians to prescribe it when it was not sound practice to do so.[17] The jury could reasonably infer from the above circumstantial evidence that Dr. Beland was induced by the manufacturer's activities to prescribe the drug and were entitled to reject Dr. Beland's testimony to the contrary. (*Bruce v. Ullery* (1962) 58 Cal.2d 702, 711 [25 Cal.Rptr. 841, 375 P.2d 833].)[18]

[16]Dr. Beland testified that he obtained his information concerning the dangers of the drug from articles in medical journals and from discussions with fellow physicians. While he could not remember specific instances in which he received any information, promotional or otherwise, directly from Parke, Davis, he did testify that he received visits by drug salesmen and that he read the journals which contained advertisements concerning Chloromycetin.

[17]This same physician testified that in his opinion most general practitioners were under the mistaken impression that the risks involved in using Chloromycetin were minimal. When asked if, in forming this impression, most doctors were influenced by the overpromotion of Parke, Davis, the doctor responded: "My opinion is based . . . on conversations with professional colleagues in my discussing with them and . . . [I] often see the response that they had been informed generally by detail men that the drug was safe and that these risks were not so or the risks had been exaggerated, and even in several situations I had been told by physicians that they were told by these detail men that the reported cause of aplastic anemia which had resulted following the use of the drug was due to impurities which had subsequently been removed."
Similar evidence of the influence on the medical profession in general was held admissible by the Supreme Court of Pennsylvania to enable the jury to resolve conflicting testimony by two defendant doctors, one of whom testified that he was adequately warned concerning the dangers of the drug, and the other that he was not warned. (*Incollingo* v. *Ewing, supra,* 282 A.2d at pp. 221-222.)

[18]Parke, Davis' reliance on *Leonard* v. *Watsonville Community Hosp.* (1956) 47 Cal.2d 509 [305 P.2d 36], as requiring a contrary result, is misplaced. In that case, we noted that there is an exception to the general rule that a party calling an adverse party as a witness under former section 2055 of the Code of Civil Procedure (now Evid. Code, § 776, as amended) is not bound by his unfavorable testimony. We explained that such testimony "may be used to dispel an inference upon which the plaintiff relies, provided the evidence is *clear, positive, uncontradicted* and of *such a nature that it cannot rationally be disbelieved.*" (*Id.* at p. 518; italics added.) But such exception does not apply here. Although Dr. Beland was called as an adverse witness, his testimony, unlike the testimony in *Leonard,* was not uncontradicted. As we have shown, considerable circumstantial evidence existed to contradict Dr. Beland's testimony.

Secondly, even assuming for the sake of argument that the jury accepted Dr. Beland's testimony that he was cognizant of the dangers of the drug, nevertheless his negligence was not, as a matter of law, an intervening cause which exonerated Parke, Davis.

It is well settled that "an actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was *reasonably foreseeable* at the time of his negligent conduct. [Citations.] Moreover, 'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.' " (*Vesely* v. *Sager* (1971) 5 Cal.3d 153, 163-164 [95 Cal.Rptr. 623, 486 P.2d 151], quoting Rest. 2d Torts, § 449; italics added.) Thus, if it was reasonably foreseeable that physicians, despite awareness of the dangers of Chloromycetin, would be consciously or subconsciously induced to prescribe the drug when it was not warranted, Parke, Davis cannot be relieved of liability because of the intervening act of Dr. Beland in prescribing the drug while cognizant of its dangers. If there is room for reasonable men to differ as to whether the intervening act was reasonably foreseeable, then the question is properly left to the jury. (*McEvoy* v. *American Pool Corp.* (1948) 32 Cal.2d 295 [195 P.2d 783]; Rest. 2d Torts, § 453, com. *a.*)

We are satisfied from a review of the evidence set forth in detail, *supra,* that the jury could reasonably find that Dr. Beland's negligent prescription of Chloromycetin for Mrs. Stevens was a foreseeable consequence of the extensive advertising and promotional campaign planned and carried out by the manufacturer. The record reveals in abundant detail that Parke, Davis made every effort, employing both direct and subliminal advertising, to allay the fears of the medical profession which were raised by knowledge of the drug's dangers. It cannot be said, therefore, that Dr. Beland's prescription of the drug despite his awareness of its dangers was anything other than the foreseeable consequence—indeed, the desired result—of Parke, Davis' overpromotion; this intervening act was "one of the hazards which makes [Parke, Davis] negligent." (*Vesely* v. *Sager, supra,* 5 Cal.3d at p. 164.)

In sum, we conclude that there is sufficient evidence in the record to support the verdict. This determination also disposes of Parke, Davis' appeal from the trial court's denial of a judgment notwithstanding the verdict. The power of the court to grant such a motion is no broader than the power to direct a verdict. (Code Civ. Proc., § 629; *Hunt* v. *United Bank & Trust*

*Co.* (1930) 210 Cal. 108, 120 [291 P. 184].) Thus, either motion may be granted " 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidenc of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' " (*Estate of Lances* (1932) 216 ·Cal. 397, 400 [14 P.2d 768].) Since we have already determined that there is sufficient evidence to support a judgment for plaintiffs, we also reject as without merit defendant's related contention that the trial court committed error in denying its motion for a judgment notwithstanding the verdict.

We now turn to defendant's final contention, that the trial court committed reversible error in respect to (a) rulings on the evidence, (b) rulings as to alleged misconduct of plaintiffs' counsel and (c) instructions to the jury.

The first two parts of defendant's contention may be treated together. Essentially, Parke, Davis claims that a fair reading of the record indicates "a deliberate and calculated attempt [by plaintiffs' counsel] to make certain that the jury would render a verdict against the defendant . . . regardless of the evidence produced." It argues that the alleged misconduct resulted in the deprivation of a fair trial and warrants reversal of the judgment against it.

But the burden rests upon appellant Parke, Davis to affirmatively demonstrate the error which it asserts. (*County of Santa Clara* v. *Superior Court* (1971) 4 Cal.3d 545, 553 [94 Cal.Rptr. 158, 483 P.2d 774].) "Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. [Citations.]" (*Horn* v. *Atcheson, T. & S. F. Ry. Co.* (1964) 61 Cal.2d 602, 610 [39 Cal.Rptr. 721, 394 P.2d 561].)

 Defendant complains that during interrogation of defendant's employee by plaintiffs' counsel, the court sustained 81 different objections and that the "vast percentage [of the questions] were clearly leading, deliberately argumentative, and done with the apparent belief that he could either get immaterial evidence before the jury or cause the jury to believe that the defendant Parke-Davis did not want them to hear all the facts." However, defendant utterly fails to substantiate the above charges by an item-by-item specification of the questions referred to, a record reference to the assignment of misconduct made, and a detailed showing of how the particular conduct constituted misconduct. Professing a desire not to "bur-

den the Court with all of the erroneous questions," defendant presents merely a list of two references to plaintiffs' opening statement and a "sampling" of eight allegedly improper questions out of a record of 1,675 pages.[19] Other than listing the questions with reference to pages of the record, defendant makes no attempt to explain how these questions taken either singly or in combination constituted prejudicial misconduct of counsel in respect to which an assignment was properly made so as to preserve the point on appeal. Such a generalized and amorphous treatment of the claim of misconduct does not satisfy defendant's burden of demonstrating the error which it asserts on appeal.

While arguing in these generalities, Parke, Davis attempts to draw a parallel between the conduct of counsel in the instant case and the misconduct of counsel for the plaintiff in *Love* v. *Wolf, supra,* 226 Cal.App.2d 378, there determined to be so prejudicial as to require a reversal of the judgment for the plaintiff. We fail to perceive the parallel. In *Love* the court concluded that "[m]isconduct of plaintiff's trial counsel, egregious beyond any in our experience or that related in any reported case brought to our attention has resulted in an unfair trial, a miscarriage of justice and requires us to reverse the judgment." (*Id.* at p. 382.)[20]

After examining the record in this case, including those sections alluded

---

[19]These consist of remarks by plaintiffs' council in his opening statement referring to Chloromycetin as "a toxin" and "a poison"; reference to the amount of revenue earned by Parke, Davis from sales of Chloromycetin; accusations by innuendo that Parke, Davis attempted to bribe an FDA official; repeated references to events occurring in 1952, even though the relevant stage of medical knowledge in this case was to be measured as of 1964; and attempts to elicit from a doctor testimony as to the death of his son in 1951, as a result of aplastic anemia. However, in its instructions the court directed the members of the jury that they "must not consider as evidence any statements of counsel made during the trial" and "must never speculate to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it supplies meaning to the answer."

[20]A review of the record therein showed 60 instances of flagrant misconduct, including repeated denigrations of defendant's counsel; references to Parke, Davis as a killer and a "con outfit"; repeated references to Parke, Davis' profits on the sale of the drug, which were exaggerated and pointed up to the jury; and repeated use of the "Do you know that" technique of questioning witnesses, which allowed counsel to make spurious statements concerning "evidence" to the jury. (*Id.* at pp. 385-391.)
"The misconduct here was intentional, blatant, and continuous from opening statement, throughout the trial, to closing argument. It was committed by a seasoned and experienced trial lawyer and the record leaves no doubt it was carefully contrived and calculated to produce a result. That sought-for result was so to arouse and inflame the jury that it would render a large verdict." (*Id.* at pp. 393-394.) The court also noted that "[e]xcepting one mild characterization of conduct by counsel as 'a little bit disgraceful' . . . and several expressions of disgust, such as, 'Let's all go home. What do you say we all go home,' there was almost no effort [by the trial judge] to keep the proceedings within the confines of propriety." (*Id.* at p. 391.)

to by defendants, we fail to find any flagrant examples of misconduct sufficient to compel a new trial. Certain conduct to which objections were made, such as references to activities taking place in 1952, did not involve impropriety at all, but pertain to relevant evidence—the beginning of a history of overpromotion of Chloromycetin that may have had residual effects in 1964. Other examples—such as references by plaintiffs' counsel to the dollar amount of sales made by Parke, Davis on Chloromycetin—were admissible to prove a motive of overpromotion (see *Love* v. *Wolf, supra,* 226 Cal.App.2d at p. 389). Indeed, counsel for Parke, Davis, far from objecting to this limited admissibility of evidence of sales, offered to stipulate as to the amount. Defendant fails to show that the incidents complained of were intentional, blatant and continuous throughout the trial so as to leave no doubt that they were carefully contrived and calculated to arouse and inflame the jury to render a large verdict. (Cf. *Love* v. *Wolf, supra,* 226 Cal.App.2d 378; see fn. 20, *supra;* see also *Weaver* v. *Shell Oil Co.* (1933) 129 Cal.App. 232 [18 P.2d 736].) Furthermore, as already pointed out (see fn. 19, *supra*), the court instructed the jury not to consider statements of counsel or to speculate to be true any insinuations in the questions of counsel.

Finally, in ruling on the motion for new trial, the trial court, noting the charge of misconduct, found that plaintiffs' attorney had "stayed well within the bounds of propriety" and conducted himself "beyond reproach." "A trial judge is in a better position than an appellate court to determine whether a verdict resulted wholly, or in part, from the asserted misconduct of counsel and his conclusion in the matter will not be disturbed unless, under all the circumstances, it is plainly wrong." (*Cope* v. *Davison* (1947) 30 Cal.2d 193, 203 [180 P.2d 873, 171 A.L.R. 667].) From our review of the instant record, we agree with the trial judge's assessment of the conduct of plaintiffs' counsel and for the reasons stated above, we are of the opinion that defendant has failed to demonstrate prejudicial misconduct on the part of such counsel.

Under the third portion of defendant's contention—alleged prejudicial error in instructions to the jury—defendant singles out only one point. It asserts somewhat obliquely that the court erred in refusing to give the instruction set forth in the margin.[21] It argues that the giving of this

---

[21]"In order to determine whether the defendant Parke, Davis & Company was negligent in this case, you must consider the medical situation as it pertained to this drug in the year 1964.

"In that connection, you may consider events that took place at an earlier time, but, in arriving at your decision on this subject, you must recognize that the undisputed medical testimony in this case has been that additional knowledge on this drug

instruction was necessary in order "to rectify the situation" allegedly created by the questions of plaintiffs' counsel which unduly emphasized the past history of Chloromycetin prior to 1964, the year it was prescribed by Dr. Beland. The court gave only the first sentence of the instruction. We find no error in its refusal to give the remaining portion since it is redundant and argumentative. Except for the above, Parke, Davis advances no argument that the court failed to fully and fairly instruct the jury. We conclude, therefore, that all three portions of defendant's final contention are without merit.

The order granting a new trial is reversed. The order denying defendants' motion for judgment notwithstanding the verdict is affirmed. The judgment is affirmed.

Wright, C. J., McComb, J., Mosk, J., Burke, J., Kaus, J.,* and Files, J.,* concurred.

---

was being accumulated and disseminated and that, in this connection, the state of medical knowledge as it existed in 1949 to 1952 cannot be considered by you as conclusively demonstrating the situation that existed in the period prior to the use of the drug in this case, in September, October, and November of 1964.

"Therefore, although you may consider historical matters, you should weigh them very carefully because, ultimately, the test to be determined is whether the attending physician in this case in 1964 was aware of the dangers and hazards of using the drugs. If, in fact, he was so aware, then any overpromotion or other activity that may have occurred at an earlier date is immaterial."

*Assigned by the Chairman of the Judicial Council.